The defendant was in possession of a female slave, called Joyce, who was claimed by the complainant; and one of the objects of the bill, was to obtain her specific delivery to the complainant. It was objected in the Circuit Court, that a bill would not generally lie for the specific delivery of slaves; and the Circuit Court being of that opinion, and that complainant had, for this and all the other matters set forth, an adequate remedy at law, dismissed the bill. From that judgment, an appeal was carried up to the Equity Court of Appeals, and upon the hearing there, that Court were equally divided on the question, whether a bill would or would not generally lie for the specific delivery of slaves; and being therefore unable to decide it, have referred it to this Court.
It had long been doubted in our Courts, whether a bill, for such a purpose, could be maintained. Slaves, in this State, are regarded as chattels; and the well settled rule in England, from whence the practice of our Courts is derived, is that, generally, a bill will not lie for their specific delivery ; and although, as I shall take occasion to shew, the propriety and necessity of making slaves, generally, an ¡exception, was felt by the bench, and the community, the Court of Chancery was reluctant and slow to innovate upon the English rule. Particular exceptions have, however, been allowed, and I had supposed, that the question had been finally settled and put to rest, in the case of Sartor vs. Gorden, 2 Hill’s Ch. 136. In that case, the opinion, that such a bill ought to be maintained, is distinctly and clearly expressed, with the intent to settle the law; and such I know to have been the intention of the whole Court, then consisting of Mr. Justice O’Neall, Chancellor Harper, and myself, That was followed by Horry vs. *257 Glover, 2 Hill, Ch. Rep. 524, the Court having the same object in view. It has, however, again been revived; and the importance of the question, and the diversity of opinion, which exists in this Court, renders it proper, that it should be re-considered.
It will be seen by recurring to the early history of the Court of chancery, in England, that, at one time, it exercised unlimited jurisdiction, in all matters of civil right, in defiance of the law Courts, and in opposition to their judgments, by enforcing right according to equity and conscience ; and of necessity, the will of the Chancellor was the law of the case. The occasional abuse of those high powers, and their necessary tendency, towards misrule, rendered them obnoxious to the English people. They have therefore been greatly abridged, by statutes and common consent; and the settled rule of that Court, now is, not to entertain jurisdiction of any cause, when the party complaining, has a complete, plain and adequate remedy at law ; and that rule is rendered imperative on us, by the Act of 1791. The Court of chancery remains, notwithstanding, a Court of supreme and general jurisdiction, and exercises the power of enforcing all legal rights, when adequate remedy cannot be obtained at law.
The only remedy, which a law Court can afford, to one to whom a wrong is done, or a right is withheld, is it’s equivalent in money ; and the inadequacy of such a remedy, in numerous instances, is too palpable to require illustration. It is equally clear, that it is at war with the great principles of natural right; a conventional substitute for what is demanded by good faith and fair dealing. If one, upon sufficient consideration, undertake to do a particular act, which he is capable of performing, as to deliver a horse, why is it that he should not be compelled to perform it 7 The thief who steals my goods, will, even in the Court of sessions, be compelled to make restitution; and why is it, that if “ a strong man armed” enter upon me, and take away my goods, that he should not be compelled to restore them ? The answer is, not that the Court of chancery, like the law Court, is incompetent, on account of its organization, to exercise such a power, or that it ought not to be confided to them; but that the expenses, and the *258 delays in a Court of chancery, are greater than at law; that chattels are generally of comparatively inconsiderable value, and that, with the money which the injured party may recover against the wrong doer, at law, he may conveniently procure the thing contracted for, or replace the goods that have been taken from him. If it be merchandize, which has been withheld or taken from him, he may every day obtain, in the market, its likeness in quality and values, if not a fac simile; and so of a flock of sheep, and so of all the varieties of ordinary chattels.
There are other reasons, which to my mind, are even more satisfactory. Chattels are necessarily, in a greater or less degree, of a "perishable nature, and are worn out or consumed by use. There is scarcely any one of the ordinary articles, of the chattel kind, which could be restored precisely in the same condition in which it was, when it was contracted for, or taken from the party complaining ; and in framing a rule of general application, the remedy was therefore left in the hands of the law Courts, as I think properly ; for pending a suit in equity, the chattel might have wholly perished, or have been so materially deteriorated in value, as to be worthless; and the party injured-, might have been at last compelled to go into a Court of law for redress.
Exceptions to the rule obtain, however, in the English Courts, in all cases where it may reasonably be supposed, that the chattel is estimated by the owner at more than its marketable value, because there is no other standard by which a Court could estimate its value in money ; as in the case of Pusey vs. Pusey, 1 Vern 270, where, on demurrer, it was held, that a bill would lie for the specific delivery of a horn, which had gone along with the complainant’s estate, time out of mind, although it does not appear by what means the defendant became possessed of it. So, in the Duke of Somerset vs. Cookson, 3 Pr. Wms. 390 ; where it was held, that a bill would lie for the specific delivery of a silver altar piece remarkable for a Greek inscription, and dedication to Hercules, against a goldsmith, who had purchased it from one who had got possession of it, (by what means it does not appear.) Upon demurrer to the bill, it was argued for the complainant, that *259 it would be “very hard, that one who comes to the possession of such a piece of antiquity, by wrong, or it may be, as a trespasser, should have it in his power to keep it, which is like a trespasser’s forcing one to part with a curiosity, or matter of antiquity, or ornament, nolens miens;” and the demurrer was over-ruled. So, in Fells vs. Reed, 3 Ves. 70; where it was held, that a bill lay for the specific delivery of a silver-snuff-box and its case, the property of a club, who had confided it to the care of the defendant, for specific purposes. So, in Loyd vs. Loring, 6 Ves. 777; which was a bill for the specific delivery of the dresses, -decorations, books, papers, and other effects, belonging to a society; in which the Lord Chancellor, (Eldon,) says, “ that this Court will hold jurisdiction, to have a chattel delivered up, I have no doubt.” In Lowther vs. Lowther, 13 Ves. 95, it seems to have been taken for granted, that a bill would lie for the specific delivery of a celebrated picture, representing Venus and Mars; and in the Lark of Macclesfield vs. Davis, 3 Ves. and Bea. 18, the Lord Chancellor (Eldon,) says, that after the cases before cited, it was too late “to discuss the question, whether this Court will interfere for the specific delivery of a chattel.”
It is conceded on all hands, that the Court of Equity, rightfully exercise the power of enforcing, specifically, the •execution of all contracts, for the sale of lands, notwithstanding the party might have an action at law, for the breach of the contract; and it is upon the same principle, that the party may not have an adequate remedy at law, not on- account of the real nature thereof, but because damages at law, which must be calculated on the.general money value of the land, may not be a complete remedy to the purchaser, to whom the estate may have a peculiar and special value. Jer. Eq. Jur. 424. One might appreciate a tract of land, on account of its fitness for a particular culture, for its salubrity, for its wholesome springs, for the beauty and extent of the view which it gave of the surrounding country, for the society which its vicinity afforded, for its contiguity to a market or a church ; whilst another, who would equally appreciate the soil, if he did not think these accessories, or some of them, injurious, would not suffer them to enter into his estimate of the *260 value of the soil. And such is the variety of our soil, and such the caprices of purchasers, that lands cannot here have any standard of marketable value, by which to measure damages.
Chancery does not, it is true, decree the specific delivery of the land; but it does so in effect, by decreeing the specific performance of the contract for the sale; and enables the party to proceed at law, where he may obtain his writ of habere facias possessionem; and if that court did not afford such a remedy, chancery would be obliged to do so, to carry out the principle on which it proceeds in enforcing the specific performance of contracts of sale.
The principles on which the English courts proceeded in the cases referred to, and in enforcing the specific performance of contracts for the sale of land, strike me forcibly as applying directly, and irresistibly, to the case of slaves generally. It seems first to have been thought of, in Brown and Gaillard, 3 DeSauss. 541; decided in 1813, in which the specific delivery of slaves was decreed, when no objection was made to the jurisdiction, and the Chancellor (BeSaussure) puts it on the ground of consent. Admitting the general rule, that a bill would not lie for chattels, he expresses a decided opinión that slaves ought to be regarded as an exception. In Wamburrzer vs. Kennedy, 4 DeSaus. 481; the question was directly made; and although it was not decided, the case bears internal evidence that the leaning of the court was in favour of the jurisdiction. The question was again raised in Chick vs. Smith et al. Harp. Eq. Rep. 298; and Chancellor Waties, who tried the cause, expressed himself as doubting about it, and decided the case on other grounds. It again came up in Rees vs. Parish, 1 M’C. Ch. 56. That was a bill for the specific delivery of slaves, which the complainants claimed under the will of their grand father ; but the report does not state under what circumstances the defendants became possessed of them, and it was held, on demurrer, that the bill could not be maintained because there was plain and adequate remedy at law: and is therefore an authority directly to the point under consideration. That was followed in Farley vs. Farley 1 McC. C.516; which is to the same effect. These last cases were decided im *261 mediately after the organization of a separate court of appeals, consisting of three judges only, all of whom had beeen selected from the law bench; and being, myself, one of' them, I feel no shame in stating, that, after ten years servitude on that bench, but few traces were left on my mind of the pratice and peculiar jurisdiction of the court of chancery, which I had acquired in my practice in that court, when at the bar; and such was doubtless the case with the other members of the court, who had been even longer on that bench. It is apparent, too, that those cases were decided without reference to that distinction which obviously exists between slaves and other chattels, and were based on a servile adherence to the English rule, and a total disregard to the principle on which it is founded.
The cases have not been preserved, but it is known to the profession, that the court of chancery have, for very many years, habitually entertained bills for the specific delivery of domestic and other favorite servants: but public opinion was not satisfied with that. When called to the bar, in 1803,1 found it the almost universal practice of the law judges, to recommend to the juries, in actions of trover, for slaves, to find for the plaintiff a greater sum than their value, with the alternative, that the plaintiff should release the damages, on the defendant’s delivering up the slaves ; and the juries entered into the spirit of it with so much zeal, that it was not unusual to find damages to an amount of double the value, or more, to make it the interest of the defendant to deliver them up. The cases of Admr. of McLean vs. Elders, 2 Mill’s Const. Rep. 184; and Norris vs. Beckly, Ibid. 22, are examples of verdicts of this description; and such continued to be the practice, until the case of McDowel vs. Murdock, 1 N. & Mc.C. 238; decided in 1818; in which it was held, on most obvious principles, that the alternative was a nullity; and that either party might treat it as such; and a new trial was granted because the jury had found an arbitrary verdict to compel the defendant to deliver up the slaves.
Having thus traced the judicial history of the question, and the progress of public opinion, in relation to it, I will again recur to the principle.
*262 In. relation to the specific execution of contracts for the sale of lands, one of the reasons given by Lord Hardwicke, in Buxton vs. Lester, 3 Atk. 383, is, that one who contracts to purchase, may be supposed to have a peculiar liking to it, and is altogether unlike matters in the way of trade; and we have seen before, that it is not on account of the real nature thereof, but on account of a supposed peculiar and special value which it may have in the estimation of the buyer; and let it be kept in mind, that this rule applies as well to an acre of the poorest sand hill barren, possessing really no intrinsic value, as to the most extensive and valuablerice, or cotton plantation; and we have seen also, that a bill may be maintained for the specific delivery of a horn or a snuff box, and whether made of the most common materials or of gold, set with the rarest and most valuable diamonds, is, according to the principle, immaterial; and it is because they may be reasonably supposed to be estimated by the owner, at more than their marketable value.
Now what is there in all this, that does not equally, and even with more force, apply to the case of a slave'? Is there any thing in a barren said hill that could attach a purchaser to it, and give it a peculiar and special value that may not be found in an able, honest, and faithful slave"? If you put their intrinsic value in competition, it will be found to be as a thousand to nothing, in fayor of the slave. It is answered, that with the value of the slave in money, recovered as damages, you may buy another. Is this, true 1 Can you go into the market, daily, and buy one like him, as you might a bale of goods, or a flock of sheep'? No. They are not to be found daily in the market. Perhaps you might be able to buy one of the same sex, age, color, height and weight, but they must differ in the moral qualities of honesty, fidelity, obedience, and industry ; in intellectual qualities of intelligence and ignorance; in physical qualities of strength and weakness, health and disease; in acquired qualities, derived from instruction, in dexterity in performing the particular labor you wish to assign him. In short, there are no two human beings, black, white, or mixed, which are exactly alike in all their moral, physical, or acquired qualities; and although the *263 peculiar qualities of a slave may be well' known and appreciated by the owner, he may be unable to furnish proof of their existence. When one goés into market to purchase a slave, or a number of them, his selection is determined by the best evidence he can obtain in reference to these qualities. And why shouldhe not have them in specie*? Why should he be sent to the courts of law, and told that “with the damages you recover in trover, you may go to the professional dealer and supply their place.” Ordinarily, they themselves can know but little of their moral qualities; and it is proverbial that you are'not to expect from them any disclosure as to their vices.
If the rule is to be carried out, the mischief does not stop here. In every well organized plantation, you will find a carpenter, a black-smith, a driver, a wagoner, a hostler, <fec. (fee.; and these are as necessary to successful planting, as four wheels, instead of three, are to a wagon. Remove one, and every thing is in disorder; and I put it to every planter to answer, whether he would not find it difficult, if not, often, impossible, to supply their places. This is not all; female slaves often have a numerous progeny; and I ask, how could yoq, in the market,- supply the place of a mother, to a dozen young children *? Apart from this, ought not her natural, and often ardent and endearing affection for her offspring, to be taken into the account*?'’ It is enough, in all conscience, that the owner has the power to break these ties; but I can never consent that it should be by the hand of fraud, or violence. >. ■
But there are other considerations which enter largely - into this question. I mean the ties (which all who know any thing of the relations.of master and slave, will appreciate,) by which the master and the slave- are united. There is the' faithful and kind old nurse, who watched over your infancy, with a tenderness and devotion little short of that which is felt by a mother, and who often supplied her place; whose value, ¿stimated by the market price, would be merely nominal. There is your body servant, who has faithfully watched'over your sick bed, who, from experience, knows and anticipates all your wants. There is the honest, diligent, and faithful old slave, who has followed the fortunes of your family for two' or three *264 generations, rejoicing in their prosperity, and sympathizing in their misfortunes, now worn down by decrepitude and old age, or infirmity. There is the more humble, but equally faithful and devoted field slave, who recommends himself to the regard of his owner, by implicit obedience to all his commands. These are not imaginary, but cases arising out of real life ; and if a stranger, by force or fraud, obtain possession of them, are you to be told that your remedy is at law; and that, with the damages which you recover, you may supply their places in the market? The existence and force of those attachments, are not susceptible of higher proof than is found in the well known fact, that when the owner is compelled, by pecuniary embarrassment, to sell his property, the slave is usually the last article that is put under the hammer. The answer is, that according to the English rule, that exception to the general rule is not allowed. That is adhering to the letter, without reference to the principle. In that country, they have no chattels bearing any resemblance to slaves, except in the single quality of value; and if we examine the principle, it will be found that the grounds on which the Courts proceed, in enforcing the, specific performance of contracts for the purchase of lands, and the specific delivery of chattels on account of their peculiar value, applies with equal force to the case of slaves. Their perpetuation, by natural increase, bears a strong resemblance to the permanency of lands. In point of value, they are at least equal. And what is there in all things besides, which can become the subject of property, that can attach the owner to it more strongly, than a faithful, honest and diligent slave ; a creature possessing all the faculties which belong to himself, capable of appreciating and reciprocating all the kindness bestowed on him? And why is it, that the Court should enforce the specific delivery of a mere toy, of little or no intrinsic value, and not a slave ? The principle inculcates no such doctrine, and a slavish adherence to the mere rule, would be to war against common sense and natural right-; against sound policy and humanity.
It is not denied, that a slave, like other chattels, may be of peculiar value to the owner; and it is conceded, that an *265 exception ought to he allowed in those special cases. But how is this peculiar value to he proved'? A particular act of devotion, calculated to excite regard in the master, might he susceptible of proof, but it does not follow that the master would appreciate him the more on that account. Most frequently, the attachment of the master to the slave, grows out of a thousand little incidents, of the influence of which, he himself is' hardly conscious; and if it arise out of some act of marked devotion, it may he known only to himself, and, therefore, incapable of proof. We all know that those attachments are generally incipient to the relations in which they stand to each other ; and the fact of their existence must be assumed. The very fact of the owner’s seeking a specific delivery, instead of going to law to recover his value, is perhaps the highest and best evidence of his prefering the slave to his value in money. It is on this principle that the Courts have proceeded, in those cases where a specific delivery has been decreed. It is not practicable to prove that one has a particular liking to a horn, or a snuff-box; but it is inferred, from circumstances, and so it must be in regard to slaves; and I have taxed my powers of reflection to their full extent, to conjure up one solitary reason why one who has been deprived of his slave, should not be permitted to determine for himself, whether he would have him again, or his value in money.
In Sartor vs. Gordon, slaves purchased expressly for the market, are supposed to be an exception to the general rule. That may be, in the main, correct; but I can well conceive that the trader may find in a slave, so purchased, even on short acquaintance, such high qualities as to induce him to keep him, rather than part with him at a lower price than his judgment, or even fancy, had suggested ; and I prefer to reserve that question until the case shall arise.
The monstrous injustice of suffering a vile and lawless trespasser to become the purchaser of my slave, against my will, and at a price which others, even an honest and impartial jury, may place upon him, is such, that I can never sanction it, unless constrained <by a rigid rule of law.
The question, whether it is necessary, in a bill for the specific delivery of slaves, to charge and prove the peculiar *266 circumstances which gave jurisdiction to the Court, has been raised, as connected with, and inseparable from, the main question.
There is no question that a complainant must state in his bill, such circumstances as will shew the jurisdiction of the Court; but it is clear enough, that he states such as, according to a general rule, entitles him to relief in equity. If it admits of an exception, and the defendant would avail himself of it, it must appear in the defence. In Pusey vs. Pusey, the allegation in the bill was, that the horn had gone along with the complainant’s estate, time out of mind, and its supposed peculiar value was inferred from that circumstance, and not from any capricious value that the complainant might have attached to it; for that was incapable of proof; and so with regard to a bill for the specific delivery of slaves. Their peculiar value, under a general rule, arises out of the fact, that they are the slaves of the complainant; and if there be an exception to the rule, it must appear in the defence.
I know, and I think properly appreciate, the jealousies that are entertained against the Court of Chancery. I know that every assumption of jurisdiction, or the application of an acknowledged principle to a new case, is denounced as an usurpation, and an infringement of the right of trial by jury. I remember that, when the Court first entertained bills for the specific delivery of domestic and other favorite servants, it was denounced as having usurped the right of trying the action of trover; that when the Court decreed the contract void, in the celebrated case of Butler vs. Haskell, 4 DeSaus. —, it was denounced as having taken upon itself the authority of vacating a contract founded on valuable consideration, with a perfect knowledge by the parties, of all their rights ; and yet, at this day, no one questions the correctness of those decisions. They are not only acquiesced in, but meet with the entire approbation of the profession.
I defer to no one in admiration of the trial by jury. It is suited to the genius and spirit of all our institutions. In it we find security against tyranny and lawless oppression ; it is our security for life, liberty and property ; and shew me that the verdict of a jury can afford me ample relief; *267 that it can protect me against threatened injury, and restore to me my lost rights, and I take my stand upon the rule prescribed by the Act of 1791. No bill can be maintained, where there is a complete and adequate remedy at law. But tell the people of this State that a stranger may •enter upon you, and carry off your female slave, the mother of a dozen children, otherwise the humblest of your gang; that he may select from them the most valuable, and drive them all off en masse, and that at law your only remedy is damages, estimated at their marketable value, and I know nothing of their feeling and opinions, if they would not arm themselves, and prepare to oppose force to force. Whatever of public odium' this judgment may bring down on the Court, I am, for myself, content to bear it, in the consciousness that, whatever may be the opinions of the passing day, the correctness of the conclusion will hereafter be approved, and that at no distant period. The principle cannot be wrong; and if the Legislature should, in its wisdom, think proper to confer on the law Court the power of applying the appropriate remedy, I venture to affirm, that it will be altogether most acceptable to the chancery.
It is said, that special circumstances entered into the cases of Sartor vs. Gordon, and Horry vs. Glover, which, confessedly gave jurisdiction to the Court, and that they are, therefore, reconcilable with the cases of Reese vs. Parish, and Farley vs. Farley, and the Court are admonished of the necessity of adhering to established precedents.
I have before remarked, and I again repeat, that the cases of Sartor vs. Gordon, and Horry vs. Glover, although they were attended with the peculiar, or rather common, circumstance, that the slaves in controversy were family slaves, it was the intention of the Court (nemo contradicente) to lay down and establish a general rule. But if the question is to be regarded as settled, by Reese vs. Parish, and Farley vs. Farley, I feel the necessity to be so imperious, that I should not hesitate to open it. The maxim, stare decisis, is invaluable, as applied to the great principles affecting the right of property. But this question affects' the remedy ; the mode of relief, only; and that ought, and must be made, to meet the exigencies of the case.
*268 The Court are, therefore, of opinion, and respond to the questions propounded by the equity Court of Appeals :
1st. That a bill well lies for the specific delivery of slaves, generally, which are withheld from the possession of the rightful owner.
2nd. That it is sufficient to give jurisdiction to the Court, to state, in such bill, that the slaves are the property of the complainant, and that their possession is withheld by the defendant.
DAVID JOHNSON.